<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MARIA SCHEPIS, | Case No.: 2:17-cv-01043 (PAZ) |
| Plaintiff, | **OPINION** |
| v. | |
| ANDREW SAUL, Commissioner of Social Security, | |
| Defendant. | |

**APPEARANCES:**

SHERYL GANDEL MAZUR, ESQ.
195 FAIRFIELD AVENUE
SUITE 2C
WEST CALDWELL, NJ 07006

      On behalf of Plaintiff

PATRICK EUGENE ROACH
SPECIAL ASSISTANT U.S. ATTORNEY
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
300 SPRING GARDEN STREET
PHILADELPHIA, PA 19123

ROBERT S. DRUM
SPECIAL ASSISTANT U.S. ATTORNEY
SOCIAL SECURITY ADMINISTRATION
OFFICE OF THE GENERAL COUNSEL
P.O. BOX 41777
PHILADELPHIA, PA 19101

      On behalf of Defendant

**PAUL A. ZOSS, United States Magistrate Judge.**

      This matter comes before the Court pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g), regarding the application of Plaintiff, Maria Schepis, for

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act (42 U.S.C. §§ 401, et seq.). Plaintiff appeals from the final decision of the Administrative Law Judge ("ALJ") denying the application; Defendant, the Commissioner of Social Security ("the Commissioner"), opposes Plaintiff's appeal.[1] After careful consideration of the record, including the ALJ hearing transcript, the ALJ's decision, and the pleadings and memoranda of the parties, the Court decides this matter pursuant to Rule 78(b) of the Federal Rules of Civil Procedure and Local Civil Rule 9.1(f). For the reasons set forth below, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case in accordance with the following instructions.

## I.    PROCEDURAL HISTORY

On January 10, 2013, Plaintiff filed an application for DIB alleging a disability onset date of July 7, 2011. (R. 20.)[2] On May 7, 2013, the Commissioner determined that Plaintiff was not disabled and denied the application. (R. 78.) On November 12, 2013, Plaintiff's application was denied on reconsideration. (R. 105.) On June 10, 2015, an ALJ held a hearing on Plaintiff's application; Plaintiff was represented by an attorney at the hearing. (R. 20.) On August 7, 2015, the ALJ issued a decision denying Plaintiff's application. (R. 17.) On December 27, 2016, the Appeals Council denied Plaintiff's request for review, thereby affirming the ALJ's decision as the "final" decision of the Commissioner. (R. 1.) On February 15, 2017, Plaintiff filed this appeal pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). ECF No. 1. On June 26, 2019, Plaintiff consented to have a U.S. Magistrate Judge conduct all further proceedings in the case to disposition pursuant

---

[1] On June 17, 2019, Andrew Saul was sworn in as the Commissioner of Social Security for a six-year term that expires on January 19, 2025. Mr. Saul is therefore substituted as Defendant in his official capacity.

[2] "R." refers to the continuous pagination of the administrative record on appeal. ECF No. 5.

to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  ECF No. 21.[3]  On

September 17, 2019, the case was reassigned to the undersigned Magistrate Judge.  ECF No. 23.

## II.    LEGAL STANDARD

### A.    Standard of Review

In reviewing applications for Social Security disability benefits, this Court has the authority

to conduct a plenary review of legal issues decided by the ALJ.  *Knepp v. Apfel*, 204 F.3d 78, 83

(3d Cir. 2000).  In contrast, the Court reviews the ALJ's factual findings to determine if they are

supported by substantial evidence.  *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000); *see also* 42

U.S.C. §§ 405(g) & 1383(c)(3).  Substantial evidence "does not mean a large or considerable

amount of evidence, but rather such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S. Ct. 2541, 101

L. Ed. 2d 490 (1988) (citation and internal quotations omitted); *see K.K. ex rel. K.S. v. Comm'r of

Soc. Sec.*, No. 17-2309 (JLL), 2018 WL 1509091, at *4 (D.N.J. Mar. 27, 2018).  Substantial

evidence is "less than a preponderance of the evidence, but 'more than a mere scintilla[.]'"  *Bailey

v. Comm'r of Soc. Sec.*, 354 F. App'x 613, 616 (3d Cir. 2009) (citations and quotations omitted);

*see K.K.*, 2018 WL 1509091, at *4.

The substantial evidence standard is a deferential one, and the ALJ's decision cannot be

set aside merely because the Court "acting *de novo* might have reached a different conclusion."

*Hunter Douglas, Inc. v. NLRB*, 804 F.2d 808, 812 (3d Cir. 1986), *cert. denied*, 481 U.S. 1069, 107

S. Ct. 2461, 95 L. Ed. 2d 870 (1987); *see also*, *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir.

2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by

---

[3] The Commissioner has provided general consent to Magistrate Judge jurisdiction in cases seeking
review of the Commissioner's decision.  *See* Standing Order In re: Social Security Pilot Project
(D.N.J. Apr. 2, 2018).

those findings, even if we would have decided the factual inquiry differently.")(citing *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999)); *K.K.*, 2018 WL 1509091, at *4 ("'[T]he district court . . . is [not] empowered to weigh the evidence or substitute its conclusions for those of the fact-finder.'") (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

Nevertheless, the Third Circuit cautions that this standard of review is not "a talismanic or self-executing formula for adjudication[.]" *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham."); *see Coleman v. Comm'r of Soc. Sec.*, No. 15-6484 (RBK), 2016 WL 4212102, at *3 (D.N.J. Aug. 9, 2016). The Court has a duty to "'review the evidence in its totality'" and "'take into account whatever in the record fairly detracts from its weight.'" *K.K.*, 2018 WL 1509091, at *4 (quoting *Schonewolf v. Callahan*, 972 F. Supp. 277, 284 (D.N.J. 1997) (citations and quotations omitted)); *see Cotter v. Harris*, 642 F.2d 700, 706 (3d Cir. 1981)(substantial evidence exists only "in relationship to all the other evidence in the record."), *reh'g denied,* 650 F.2d 481 (3d Cir. 1981). Evidence is not substantial if "it is overwhelmed by other evidence," "really constitutes not evidence but mere conclusion," or "ignores, or fails to resolve, a conflict created by countervailing evidence." *Wallace v. Sec'y of Health & Human Servs.*, 722 F.2d 1150, 1153 (3d Cir. 1983) (citing *Kent*, 710 F.2d at 114); *see K.K.*, 2018 WL 1509091, at *4. The ALJ decision thus must be set aside if it did not take into account the entire record or failed to resolve an evidentiary conflict. *See Schonewolf*, 972 F. Supp. at 284-85 (citing *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978)).

Although the ALJ is not required "to use particular language or adhere to a particular format in conducting [the] analysis," the decision must contain "sufficient development of the

record and explanation of findings to permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 120 (3d Cir. 2000)); *see K.K.*, 2018 WL 1509091, at *4. The ALJ must provide "an explanation . . . of the reason why probative evidence has been rejected . . . so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07; *see Burnett*, 220 F.3d at 121 ("Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence.") (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999)). "[T]he ALJ is not required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter v Harris*, 650 F.2d 481, 482 (3d Cir. 1981). Absent such articulation, the Court "cannot tell if significant probative evidence was not credited or simply ignored." *Cotter*, 642 F.2d at 705. As the Third Circuit notes:

> [U]nless the [ALJ] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Gober*, 574 F.2d at 776 (internal quotations omitted); *see Schonewolf*, 972 F. Supp. at 284-85.

Following review of the entire record on appeal from a denial of benefits, the Court can enter "a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). Remand is appropriate if the record is incomplete or if the ALJ's decision lacks adequate reasoning or contains illogical or contradictory findings. *See Burnett*, 220 F.3d at 119-20; *Podedworny v. Harris*, 745 F.2d 210, 221-22 (3d Cir. 1984). Remand is also appropriate if the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the

record.  *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *see A.B. on Behalf of Y.F. v. Colvin*, 166 F. Supp. 3d 512, 518 (D.N.J. 2016).  A decision to "award benefits should be made only when the administrative record of the case has been fully developed and when substantial evidence on the record as a whole indicates that the claimant is disabled and entitled to benefits." *Podedworny*, 745 F.2d at 221-22 (citations omitted); *see A.B.*, 166 F. Supp. 3d at 518.  In assessing whether the record is fully developed to support an award of benefits, courts take a more liberal approach when the claimant has already faced long processing delays.  *See, e.g.*, *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).  An award is "especially appropriate" when "further administrative proceedings would simply prolong [a plaintiff's] waiting and delay his ultimate receipt of benefits."  *Podedworny*, 745 F.2d at 223; *see Schonewolf*, 972 F. Supp. at 290.

  **B.**  **Standard for Awarding Benefits**

  Under the Social Security Act, an adult claimant (i.e., a person over the age of eighteen) is disabled and eligible for Social Security disability benefits based on an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  20 C.F.R. § 404.1505(a).  An impairment is "medically determinable" if it results from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 404.1529(b).  Thus, an impairment can be established by objective medical evidence from an acceptable medical source but cannot be established by a claimant's statement of symptoms, a diagnosis, or a medical opinion.  20 C.F.R. § 404.1521.

The process for determining an adult's claim for Social Security disability benefits involves a five-step sequential inquiry. 20 C.F.R. § 404.1520(a)(4).[4]   The claimant bears the burden of proof at Steps One through Four. *Hess v. Comm'r of Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019) (citing *Smith v. Comm'r of Soc. Sec.*, 631 F.3d 632, 634 (3d Cir. 2010)). At Step Five, the burden shifts to the Commissioner. *Id.* At each Step, the ALJ must consider the combined effect of all the claimant's physical and mental impairments without regard to whether any single impairment, if considered separately, would be of sufficient severity to proceed to the next Step. 20 C.F.R. § 404.1523(c).

At Step One, the ALJ decides whether the claimant is performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). If so, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Two.

At Step Two, the ALJ decides whether the claimant has any "severe impairment" or combination of impairments that meets certain regulatory requirements. 20 C.F.R. § 404.1520(c); *see Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 546 (3d Cir. 2003) (this Step "is a *de minimis* screening device to dispose of groundless claims"). A "severe impairment" is one that "significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, then the inquiry ends because the claimant is not disabled. Otherwise, the ALJ proceeds to Step Three.

At Step Three, the ALJ decides whether the claimant's impairment or combination of impairments "meets" or "equals" the severity of an impairment in the Listing of Impairments

---

[4] This case arises from a claim filed before March 27, 2017 and is therefore analyzed by this Court – as it was by the ALJ – under 20 C.F.R. § 404.1527.

("Listing") found at 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. § 404.1520(d).  If so, then the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.  *Id*. § 404.1509.  Otherwise, the ALJ proceeds to Step Four.

At Step Four, the ALJ must determine the claimant's residual functional capacity ("RFC") and determine whether the claimant can perform past relevant work.  20 C.F.R. §§ 404.1520(e)-(f).  The RFC is the claimant's maximum ability to do physical and mental work activities on a sustained basis despite limitations from impairments.  Social Security Ruling 96-8p, *Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims*, 1996 WL 374184, at *2 (S.S.A. July 2, 1996).  Past relevant work is performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last fifteen years or fifteen years prior to the disability date.  20 C.F.R. §§ 404.1560(b)(1), 404.1565(a); Social Security Ruling 82-61, *Titles II and XVI: Past Relevant Work – The Particular Job or the Occupation as Generally Performed*, 1982 WL 31387, at *1-2 (S.S.A. Jan. 1, 1982).  In addition, the work must have lasted long enough for the claimant to learn to do the job and be engaged in substantial gainful activity.  20 C.F.R. § 404.1560(b)(1).  If the claimant can perform past relevant work, then the inquiry ends because the claimant is not disabled.  Otherwise, the ALJ proceeds to Step Five.

At Step Five, the ALJ must decide whether the claimant, considering her/his RFC, age, education, and work experience, can perform other jobs that exist in significant numbers in the national economy.  20 C.F.R. § 404.1520(g).  Depending on the claimant's limitations, the ALJ will either follow the Medical-Vocational Rules (also referred to as "Grid Rules") found at 20 C.F.R. § 404, Subpart P, Appendix 2, or use the Grid Rules as a framework for decision-making.  20 C.F.R. § 404.1569a.  The ALJ's consideration at this Step "typically involves 'one or more

hypothetical questions posed by the ALJ to [a] vocational expert.'" *Hess*, 931 F.3d at 204 (quoting *Podedworny*, 745 F.2d at 218). If the ALJ determines that the claimant can perform other jobs that exist in significant numbers in the national economy, then the claimant is not disabled. Otherwise, the claimant is presumed to be disabled if the impairment or combination of impairments has lasted or is expected to last for a continuous period of at least twelve months.

## III.    ALJ DECISION AND APPELLATE ISSUES

Plaintiff was 52 years old on the alleged onset date of July 7, 2011. (R. 79.)[5] At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. 22.) At Step Two, the ALJ found that Plaintiff had the following severe impairments: chronic neck and back pain syndrome, right shoulder impairment, and bilateral knee osteoarthritis. (R. 22.) At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of any Listing. (R. 23.) At Step Four, the ALJ found that Plaintiff has the residual functional capacity to perform sedentary work, except no lifting overhead with her right arm; no continual and repetitive moving head left to right; and alternating sitting and standing every 1/2 hour to one hour, at Plaintiff's election. (R. 23.) The ALJ also found at Step Four that Plaintiff could not perform her past relevant work as a controller as she actually performed it, because she performed it at the light level of exertion and her RFC limited her to sedentary work, but she was was able to perform the job as it is generally performed in the national economy. (R. 27.) The ALJ concluded that Plaintiff was not disabled at any time between the alleged onset date and the decision date. (R. 27.)

---

[5] The relevant period for Plaintiff's DIB application is July 7, 2011 (alleged onset date) through December 31, 2016 (date last insured). (R. 79.)

Plaintiff presents three arguments on appeal. First, Plaintiff contends that the ALJ erred when he found that Plaintiff's past work as a controller constitutes past relevant work; Plaintiff asserts that the position was a "composite job" that could not be evaluated at Step Four. ECF No. 13 at 14. Second, Plaintiff asserts that the ALJ erred in assessing Plaintiff's RFC because the medical evidence does not demonstrate that Plaintiff can perform sedentary work with only overhead restrictions. *Id.* at 20. Third, Plaintiff argues that the ALJ failed to properly evaluate Plaintiff's subjective complaints of pain. *Id.* at 23. Plaintiff asks the Court to reverse the Commissioner's final decision and remand the matter for a new hearing. *Id.* at 26. The Commissioner contends that the ALJ's decision should be affirmed in its entirety because it correctly applied the governing legal standards, reflected consideration of the entire record, and was supported by sufficient explanation and substantial evidence. *See generally*, ECF No. 16.

## IV.    SUMMARY OF RELEVANT BACKGROUND

### A.    Medical Evidence

#### 1.    Treating Physicians

Plaintiff was involved in car accidents in December 2010 and October 2011. (R. 24.) After the car accident in December 2010, Plaintiff went to the emergency room for evaluation, but she had a normal neurological exam, CT scan, and x-ray, and she was discharged the same day. (R. 354.) Plaintiff followed up with David Loya, M.D., an orthopedist, for an evaluation on December 8, 2010. Dr. Loya found that Plaintiff suffered from a left knee contusion, patellofemoral arthritis, cervical and lumbar strains, cervical spondylitis, and right shoulder strain. (R. 294.) He prescribed a course of physical therapy. (R. 295.)

Plaintiff began a four-week regimen of physical therapy on December 13, 2010. (R. 304, 307.) At the initial evaluation, Plaintiff complained of pain in her left knee, neck, back and right

shoulder.  (R. 304.)  By December 20, 2010, Plaintiff reported to her physical therapist that her neck and knee were feeling "a little better" and that her knee felt stronger with stairs, but her back was bothering her from increased standing.  (R. 296.)  An MRI of the left knee in April 2011 demonstrated osteoarthritic changes at the patellofemoral articulation, medial meniscal degenerative changes, intrasubstance degenerative signal changes and a small inferior surface tear, and small joint effusion.  (R. 521.)

After the second car accident in October 2011, Plaintiff presented to Vani Maddali, M.D. complaining of headaches.  (R. 310.)  Dr. Maddali diagnosed Plaintiff with headaches, muscle spasms, cervicalgia, and pain in the joints and lower leg, and prescribed a four-week course of physical therapy.  (R. 308-12.)  Plaintiff completed two weeks of physical therapy and did not return for treatment after November 10, 2011.  (R. 324-332.)  A CT scan of Plaintiff's head on November 7, 2011 indicated no intracranial hemorrhage or extra-axial collection.  (R. 313.)

On November 11, 2011, Plaintiff went to the emergency room because she experienced increasing right hip pain.  (R. 379.)  Plaintiff at that time was diagnosed with acute sciatica and was discharged.  (R. 381.)  She was told that "serious conditions such as disc herniation cannot be ruled out except with MRI which is not indicated at the present time but which may be indicated on re evaluation exam."  (R. 381.)  Imaging of Plaintiff's spine on the same date indicated "[m]ultilevel degenerative disc disease . . . most pronounced at the L5-S1 level where there is loss of disc space height, vacuum phenomenon and anterior osteophytes."  (R. 389.)

Plaintiff began treatment with Marco Tartaglia, M.D. on November 28, 2011.  (R. 448.)  At that time, she complained of severe headaches, a stiff neck, and pain in both sides of her neck, shoulders, lower back, and left knee.  (R. 448.)  Dr. Tartaglia noted that Plaintiff had a sprain/strain in her cervical and lumbar spine, a sprain in her left knee, and impingement of the nerve root, and

he prescribed a muscle relaxer, sleep medication, and physical therapy. (R. 449.) On December 16, 2011, Plaintiff still reported neck pain, pain in between her shoulder blades, and lower back pain and advised that she woke up with pain every few hours during the night. (R. 450.) Dr. Tartaglia again prescribed a muscle relaxer and added Celebrex. (R. 450.)

An MRI of Plaintiff's shoulder was performed in January 2012 which demonstrated "grade 1 shoulder impingement syndrome with moderate tendinopathy/tendinitis of the supraspinatus tendon and a partial tear within the mid aspect of the tendon," with "associated bursitis and a small joint effusion." (R. 456.) An MRI of Plaintiff's cervical spine demonstrated "moderate disc bulging at C4-5 and C5-6 moderately impressing on the anterior thecal sac at these levels." (R. 457.) An MRI of Plaintiff's lumbar spine demonstrated "right-sided foraminal disc herniation at L2-3 impressing on the anterior thecal sac and narrowing the lateral recesses at this level," "central disc herniation at L5-S1 impressing on the anterior thecal sac and moderately narrowing the lateral recesses at this level, especially on the left" and "mild disc desiccation" was also noted. (R. 458.)

In February 2012, Plaintiff complained of headaches, a stiff neck, swelling on the left side of her neck, and a "pulling sensation" on her skull, left ear and left side of chest. (R. 451.) Dr. Tartaglia prescribed Fioricet for Plaintiff's headaches, a muscle relaxer, and physical therapy. (R. 452.) Plaintiff attended physical therapy for two sessions in February and March 2012. (R. 393.)

Plaintiff presented to Alfred Mauro, M.D., of Core Pain Management, LLC, on February 29, 2012, at which time Dr. Mauro opined that Plaintiff had cervical and lumbar disc displacement, cervical and lumbar myofascitis, and possible cervical and lumbar radiculopathy. (R. 413-14.) Dr. Mauro requested that an upper and lower EMG/NCV study be performed "to properly and accurately diagnose [Plaintiff's] condition" and either rule out or confirm the presence of radiculopathy, which would assist "with an accurate diagnosis, provide a prognosis and . . . help

formulate a care plan." (R. 414.) Plaintiff did not consent to the study and returned to conservative care. (R. 428.) On March 6, 2012, Plaintiff had an initial orthopedic evaluation with Manik Singh, M.D., who opined that Plaintiff had rotator cuff tendinosis, subacromial bursitis, AC joint arthropathy, and shoulder pain and suggested a platelet rich plasma injection. (R. 473-74.)

On April 20, 2012, Plaintiff again sought treatment from Dr. Tartaglia, at that time still complaining of neck pain, headaches, right shoulder pain, and pain in the right side of her chest, her lower back, and both hips. (R. 460.) Dr. Tartaglia noted disc bulges at the cervical spine, disc herniation at the lumbar spine, ligament tear, tendinitis, and bursitis in the right shoulder. (R. 460.) Plaintiff also reported neck and back pain to Dr. Tartaglia on May 4, 2012, at which time the doctor suggested that Plaintiff see an orthopedist concerning her shoulder pain. (R. 461.)

By May 16, 2012, Plaintiff decided to have the EMG/NCV study that Dr. Mauro previously suggested, which revealed evidence of a right C5 radiculopathy and a left L5/S1 radiculopathy. (R. 415, 437.) En-Chia James Liu, M.D., also of Core Pain Management, LLC, evaluated the study results and determined that Plaintiff was a good candidate for a series of epidural steroid injections. (R. 416.) On June 23, 2012, Plaintiff had an epidural steroid injection on her right side. (R. 412, 417.) Plaintiff reported on August 8, 2012 that the injection helped reduce her cervical pain, which she rated as 4/10, and also decreased both the pain radiating into her left arm and her upper extremity numbness. (R. 417.) However, she still experienced lower back pain radiating into both legs. (R. 417.) On August 20, 2012, Plaintiff reported to Dr. Tartaglia that her pain continued to worsen, to the point that she could hardly walk. (R. 466.) Plaintiff then had an epidural steroid injection in her left side and reported on August 29, 2012 that her left side felt a little better and the leg pain was no longer present, but she still had residual back pain. (R. 420.) According to Dr. Liu, "[o]verall, she reports a pain reduction from an 8 to a 6 and would like to

proceed with one more injection[.]" (R. 420.) Dr. Liu opined that Plaintiff was a candidate for another right-sided epidural steroid injection, which he believed would "definitively relieve the patient's lower back pain." (R. 421.) The administrative record contains no evidence that Plaintiff ever received another epidural steroid injection.

On September 7, 2012, Plaintiff reported to Dr. Tartaglia that her headaches persisted; she had a very stiff neck, such that she could not turn her head side to side; and that the pain in her lower back persisted. (R. 467.) In a treatment note from Dr. Tartaglia dated September 21, 2012, Plaintiff still complained of pain under the left scapula, and reported pain in her lower back, left leg, and left knee. (R. 468.) On October 3, 2012, Plaintiff presented to Dr. Maddali for evaluation because Plaintiff was traveling to Italy for three months and was experiencing back pain at that time. (R. 484.) Dr. Maddali observed that Plaintiff had no deformity or tenderness of joints and spine, noted a full range of motion, and diagnosed Plaintiff with a backache, unspecified; arthritis; and obesity, unspecified. (R. 485.) Plaintiff returned to Dr. Tartaglia two days later, on October 5, 2012, complaining of severe pain in her lower back that radiated to her left hip and shot down to her left leg and foot; Dr. Tartaglia diagnosed Plaintiff with sciatica. (R. 512.)

On May 10, 2013, Plaintiff presented to Uma Duvvuri, M.D. to obtain medication refills. (R. 496.) She reported at that time that she was taking ibuprofen and Flexeril in connection with her joint pain, and the medicines provided some relief. (R. 496.) Plaintiff had pain in her knee, lower back, shoulder and neck, but no joint pain, weakness, falls or limited movement. (R. 496.) Dr. Duvvuri noted no deformity or tenderness of the joints and spine and a full range of motion. (R. 497.) Dr. Duvvuri's diagnosis was a muscle spasm, arthritis, obesity, and vitamin D deficiency. (R. 497.)

On July 22, 2013, Plaintiff presented to Erica N. David, M.D., who reviewed Plaintiff's history of back complaints. (R. 504.) Upon examination of Plaintiff, Dr. David found that Plaintiff had decreased range of motion in the cervical spine and lumbosacral spine, decreased flexion and extension in bilateral knees, and tenderness to palpation in the cervical and lumbar paraspinal musculature. (R. 505.) Dr. David further noted tenderness to palpation along the anterior medial aspect of both knees with crepitus with range of motion on the left knee. (R. 505.) Dr. David diagnosed Plaintiff with internal derangement of the knee, cervicalgia, lumbago and myofascial pain and suggested physical therapy and a topical pain cream. (R. 505.) Although Dr. David indicated that she sought to obtain and review Plaintiff's past x-ray and MRI results, she nonetheless opined that Plaintiff is disabled. (R. 505.)

The results of a March 13, 2014 MRI, performed because of Plaintiff's claims of severe neck and right shoulder pain, were unremarkable except for mild hypertrophy without significant canal or foraminal uncovertebral narrowing at the C4-C5 level and degenerative uncovertebral hypertrophy with mild canal narrowing and no foraminal narrowing at the C5-C6 level. (R. 510.) On April 25, 2014, a CT scan of Plaintiff's right knee demonstrated mild-to-moderate medial and lateral compartment osteoarthritis, moderate patellofemoral compartment arthritis with mild lateral subluxation and tilt of the patella, knee joint effusion, and a cyst. (R. 517.) Plaintiff received a lidocaine injection on the same day from Richard A. Boiardo, M.D. (R. 529.) A CT scan of Plaintiff's left knee on May 24, 2014 demonstrated mild tricompartment knee osteoarthritis, more pronounced in the medial compartment with subchondral sclerosis and joint space narrowing, and small knee joint effusion. (R. 519.) An MRI of Plaintiff's right shoulder on the same date revealed a "full-thickness, complete tear of the supraspinatus with retraction to the 12 o'clock position of the humeral head," and "full-thickness partial width tear of the insertion of the infraspinatus,"

"tendinosis with insertional tearing of the subscapularis," grade 2 supraspinatus muscle atrophy, joint osteoarthritis and degeneration of the superior and anterior labrum, joint effusion, "prominent subcortical cystic change rotator cuff insertion of the humerus," and joint arthrosis.  (R. 523-24.)

Plaintiff was evaluated on July 15, 2014 by Nicholas Avallone, M.D. at St. Luke's Orthopaedic Specialists, at which time Plaintiff's chief complaints were knee and shoulder pain. (R. 537.)  Plaintiff reported that the pain in her knee was worse with walking and better with rest. (R. 537.)  Her shoulder pain was aggravated by trying to lift overhead objects.  (R. 537.)   On August 12, 19, and 26, 2014, Plaintiff received injections of Euflexxa for her knee pain.  (R. 531, 533, 535.)

On January 16, 2015, Plaintiff presented to Daniel Mendez, M.D., again complaining of shoulder and knee pain and seeking relief because she was going away for one month.  (R. 541, 543.)  In an evaluation completed on that date, Plaintiff indicated that she has constant pain in her knees and right shoulder.  (R. 546.)  She indicated that she is independent in her activities of daily living, is active with no formal exercise, but had chronic pain in her lower back, although epidurals in 2012 helped with the pain long term.  (R. 547.)  At that time, Dr. Mendez noted no tenderness of the spine, no muscle spasms and no myofascial trigger points, normal range of motion in the spine, and no segmental instability.  (R. 542.)  Dr. Mendez suggested right shoulder and right knee injections, which were performed the same day.  (R. 543-45.)  Two months later, on March 20, 2015, Plaintiff reported to a physical therapist that she had pain in her knees, right shoulder and lower back, and that most activities of daily living were extremely difficult to perform or could not be performed.  (R. 559-60.)

### 2.     Consultative Examinations

Plaintiff was evaluated by Justin Fernando, M.D. on April 10, 2013.  Plaintiff reported that she had back pain for approximately ten years, but the pain was exacerbated after the 2011 car accident.  (R. 487.)  She indicated that the pain in her lower back radiated bilaterally into both lower extremities, and she also reported pain in her knees, with worse pain in her left knee.  (R. 487.)  Plaintiff told Dr. Fernando that "[a]ny form of physical activity is associated with the provocation of pain and the aggravation of pain."  (R. 487.)  Upon examination, Plaintiff walked on her heels and toes, albeit with some difficulty, and there was no evidence of any significant tenderness over the midline or the paraspinal areas of the lower back.  (R. 488.)  Dr. Fernando noted that the cervical spine showed normal flexion and extension and a mild degree of restriction in the lateral flexion.  (R. 488.)  In the lumbar spine, there was no limitation in the range of motion in flexion and extension and in lateral flexion bilaterally.  (R. 488.)  Dr. Fernando reported that the joints of the upper extremities, shoulders, elbows, forearms, wrists and fingers were capable of a full range of motion.  (R. 488.)  In the lower extremities, Dr. Fernando noted both knees were restricted to flexion and extension, the left more so than the right.  (R. 488.)  The left knee also demonstrated the presence of joint line tenderness and "possibly even a mild effusion in the joint." (R. 488.)  Plaintiff's hips and both ankles had a full range of motion, and the "deep tendon reflexes in both lower extremities . . . were found to be brisk, and brisk enough to exclude the likelihood of disk herniation or nerve impingement."  (R. 488.)

Dr. Fernando diagnosed Plaintiff with chronic lower back pain with bilateral subjective symptoms of radiculopathy, noting there is "no clinical indication of disk involvement at least in the lower lumbosacral disks," chronic pain in the cervical spine with subjective symptoms of radiculopathy ("no clinical indication of involvement of the disks or impingement of the nerve

roots"), chronic degenerative joint disease/osteoarthritis of both knees, and obesity. (R. 488-89.) Dr. Fernando noted that despite Plaintiff's history of back pain, her reflexes at the time of examination were "brisk enough that it does not appear that there has been any persistence of the disk problems or the nerve root impingement that is evident now." (R. 489.) He noted as "significant" the chronic disease in both of Plaintiff's knees and opined that "weightbearing could very well be painful." (R. 489.)

Plaintiff also had a psychological exam on April 25, 2013 with Marc Friedman, Ph.D. (R. 492.) Dr. Friedman noted that Plaintiff's memory, concentration, attention span and persistence were adequate, and her ability to deal with routine stress in a work environment would be adequate. (R. 494.) He also noted that Plaintiff's pace in solving cognitive problems was relatively fast, and her social interaction skills were good. (R. 493.) Dr. Friedman opined that Plaintiff did not show any signs of psychiatric illness. (R. 494.)

### 3.    State Agency Examinations

Toros Shahinian, M.D. reviewed Plaintiff's application for DIB at the initial level and found Plaintiff "not disabled" because she could perform her past relevant work as a controller as actually performed. (R. 89.) In so finding, Dr. Shahinian found that Plaintiff could occasionally lift and/or carry up to twenty pounds in an 8-hour work day, could frequently lift and/or carry ten pounds, could stand and/or walk for four hours, could sit for a total of six hours, and had no other limitations for pushing and/or pulling. (R. 87.) He also found that Plaintiff could frequently climb ramps/stairs, balance, stoop, kneel, crouch or crawl. (R. 87.) Dr. Shahinian referred to Dr. Fernando's consultative evaluation in support of his determination. (R. 88.)

On reconsideration in August 2013, Dr. Nikolaos Galakos reviewed the July 2013 report of Dr. David, which noted Plaintiff's complaints of lower back pain, knee pain, neck and shoulder

pain, and decreased range of motion of the spine. (R. 99, 108.) Dr. Galakos revised Plaintiff's postural limitations, finding that she could only occasionally climb ramps/stairs, balance, stoop, kneel, crouch or crawl. (R. 101.) Dr. Galakos nevertheless found that Plaintiff could perform her past relevant work as actually performed and determined that she was "not disabled." (R. 118.)

### B.    Non-Medical Evidence

### 1.    Plaintiff's Work History Report

In a Work History Report dated January 23, 2013, Plaintiff described her past work as a controller for "hotels, bakeries, shopping centers, residential rentals, and general contracting" businesses. (R. 205.) Plaintiff described her duties as follows:

> Oversaw an accounting staff of approximately 20. Prepared monthly and quarterly sales tax returns. Reviewed quarterly GL and AP for approximately ten companies. Reviewed A/R for eight companies on a monthly basis. Maintained daily cash control log for 7 companies. Reviewed and signed off on payroll for approx. 70 employees. Reviewed weekly check runs and signed checks to vendors for 3 companies (approx. 100 cks every 2 weeks). Handled all DOL issues and audits. Administered and bid out all insurance policies for approx. 30 commercial locations (insurance) valued @ = $1.5M. Handled workers comp audits for aggregate payroll in excess of $12M. Administered all property claims (i.e. in June 2011 valued @ = $5M). Administered all employee health insurance policies for 8 companies, including preparing all paperwork and applications involved in switching health care provider twice in 24 months. Administer corp. officer's health insurance policies and year end bonuses. Handled liquor license applications and/or renewals for 5 locations. Made court appearances on behalf of the company on DOL, land use variance and summons issues. Facilitated the switch from Paychex to ADP payroll processing companies in 2010 for = 700 employees. Responsible for YE W2 reconciliations and release to employees. Construction cost/project manager on $12M project in 2010, $8M hotel expansion in 1997, and a $6M retail space construction in 1992. Negotiated all lease rentals for 10,000 sf shopping center as well as a 4 unit office building. Review and sign monthly inter-company checks, approx. 50 checks/mo. Implemented computerized accounting (AP and GL) system in 1992 and a new computerized AR system in 1994. Including training of all employees and transfer from and

> reconciliation to manual books.  Prepared all backup documentation for A & P Bankruptcy claim for secured and unsecured debts due to my employer.  Set up employee handbooks, sexual harassment handbook, and facilitated classes for all of management staff.  Handle all H&R issues for circa 700 employees.  Handled all EPLI and sexual harassment issues whenever necessary.

(R. 206, 211-12.)

Plaintiff reported that in her past job, she did "some filling of and lifting of file boxes to be archived" on a quarterly basis, and on a daily basis she carried file folders and a brief case from one location to another.  (R. 206.)  She reported that the heaviest weight she lifted was ten pounds and she frequently lifted less than ten pounds.  (R. 206.)  She reported that she walked 2.4 hours per day, stood 2.4 hours per day, sat for 6 hours per day, and crouched for 0.2 hours per day. (R. 206.)  She also spent thirty percent of her time supervising employees, she hired and fired employees, and was a "lead worker."  (R. 206.)

### 2.    Plaintiff's Hearing Testimony

At the hearing before the ALJ, Plaintiff testified that within the past fifteen years, she worked as a controller for a family-owned business.  (R. 40, 41.)  The business owned hotels, retail businesses, and apartments.  (R. 40.)  While the ALJ stated that the position is typically a sedentary job, Plaintiff responded that in her case, she traveled to the company's different offices three times per week.  (R. 40.)  When she traveled to different offices, she took file boxes and a big briefcase, and even though the company provided a briefcase on wheels, she still had to carry it up and down steps.  (R. 49.)  Plaintiff testified that the title of "controller" was "not really comprehensive enough," because she was a "jack of all trades."  (R. 50.)  When the ALJ asked Plaintiff if she was "a comptroller in a more general, broader sense," Plaintiff replied "[c]omptroller, and then like when we opened, I was with them to open two new bakeries, three new restaurants" and she put

the controls and safeguards in place. (R. 52.) When the company built new hotels, Plaintiff went to the construction sites and did the bidding. (R. 50.)

### 3.    Statement from Plaintiff's Former Employer

After the hearing, Plaintiff's former employer, Anthony Calandra, submitted a statement concerning Plaintiff's previous employment. (R. 187.) Mr. Calandra indicated that Plaintiff began as a "part time accounting clerk" but, over the years, she became a "full charge bookkeeper, accounting office manager, construction purchasing agent and contract administrator, as well as insurance procurer (group health, business owners, commercial real estate, and residential real estate)" and also managed "all aspects of human resources issues including benefits, sexual harassment, etc." (R. 187.) Mr. Calandra noted that for some time, Plaintiff functioned as a property manager for more than 170 residential units and a 14 unit retail shopping center, in which capacity she was responsible for the negotiation and execution of all retail tenant leases and individual residential apartment leases. (R. 187.) According to Mr. Calandra, Plaintiff worked with outside computer programming companies during two computer system replacements, and she prepared monthly and quarterly financial reports. (R. 187.) Plaintiff also prepared and submitted sales tax returns for six companies and was responsible for auditing the petty cash reserves at six locations and the cash receipts at all six locations, as well as "reconcil[ing] all the Brinks deliveries to the Bank." (R. 187.) Mr. Calandra summarized that "[d]uring the last maybe five to ten years of her tenure with my companies, her job title was that of Controller, however, her duties encompassed a much broader array of responsibility." (R. 187.)

## V.    DISCUSSION

### A.    Plaintiff's Challenge to the Past Relevant Work Determination

At Step Four, the ALJ must consider whether the claimant retains the RFC to perform past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv).  Step Four involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level or capability needed to perform the past relevant work.

*Garibay v. Comm'r of Soc. Sec.*, 336 F. App'x 152, 158 (3d Cir. 2009) (quoting *Burnett*, 220 F.3d at 120).  Past relevant work is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

In considering a claimant's past relevant work, the Social Security Administration will ask the claimant for information about work he has done in the past. 20 C.F.R. § 404.1560(b)(2).  The Social Security Administration may also ask other people who know about the claimant's work or utilize "the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' . . . published by the Department of Labor, to obtain evidence we need to help us determine whether [the claimant] can do [his or her] past relevant work, given [the claimant's] residual functional capacity." *Id.*

Social Security Ruling 82-62 provides guidance on how the ALJ should determine whether the claimant can perform past relevant work.  This regulation states that "[t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work."  Social Security Ruling 82-62, *Titles II and XVI: A Disability Claimant's*

22

*Capacity to Do Past Relevant Work, in General*, 1982 WL 31386, at *3 (S.S.A. Jan. 1, 1982).  The regulation further provides that "[d]etermination of the claimant's ability to do [past relevant work] requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy."  *Id.*

Social Security Ruling 82-61 provides further guidance on how an ALJ should evaluate whether a claimant can perform past relevant work.  The regulation states that an ALJ should determine whether "the claimant retains the capacity to perform the particular functional demands and job duties peculiar to an individual job as he or she actually performed it" or "as ordinarily required by employers throughout the national economy."  Social Security Ruling 82-61, *Titles II and XVI: Past Relevant Work – The Particular Job or the Occupation as Generally Performed*, 1982 WL 31387, at *1-2 (S.S.A. Jan. 1, 1982); *see also Garibay*, 336 F. App'x at 158.  S.S.R. 82-61 recognizes that some work as actually performed requires duties significantly in excess of those generally required for the job:

> A former job performed . . . by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. . . . [I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

S.S.R. 82-61, 1982 WL 31387, at *2; *see also Garibay*, 336 F. App'x at 158.

Not all past relevant work can be classified into a single definition in the *Dictionary of Occupational Titles* ("DOT").  As one court in this district noted, "[s]ome jobs defy easy categorization, and information about the general requirements for performing those jobs may not be available in the DOT.  So-called 'composite jobs' have significant elements of two or more occupations and, as such, have no counterpart in the DOT."  *Levyash v. Colvin*, Civ. A. No. 16-2189 (BRM), 2018 WL 1559769, at *11 (D.N.J. Mar. 30, 2018) (citing *Standowski v. Colvin*, Civ. A. No. 13-05663 (FLW), 2015 WL 404659, at *16 (D.N.J. Jan. 29, 2015)); *see also* S.S.R. 82-61 ("[C]omposite jobs have significant elements of two or more occupations and, as such, have no counterpart in the DOT.").

Plaintiff contends that the ALJ erred in finding that she could perform work as a controller as generally performed because her past work was not only that of controller, but was a composite job requiring Plaintiff to fulfill the duties of many positions.  Plaintiff contends that her testimony before the ALJ, as well as her Work History Report and the statement from her former employer, demonstrate that her work required the duties of property management, cashier, human resources, and information technology, which duties extend beyond the job description of controller contained in the DOT.  ECF No. 13 at 18-19.  Plaintiff cites Program Operations Manual System ("POMS") DI 25005.020 for the proposition that a composite job will not have a DOT counterpart and, therefore, cannot be evaluated at Step Four because the job "does not exist as generally performed."  *Id.* at 16, 20.  Because the ALJ failed to consider whether Plaintiff's position was a composite job, Plaintiff asserts that the ALJ erred in finding Plaintiff not disabled at Step Four. *Id.* at 20.

In response, the Commissioner argues that the ALJ's decision is supported by substantial evidence of record.  ECF No. 16 at 14.  The Commissioner contends that the ALJ "fully considered

Plaintiff's former employer's description of Plaintiff's job duties, identifying Plaintiff's various positions held over the years." *Id.* According to the Commissioner, because the ALJ determined that Plaintiff was able to perform the work as it is generally performed, the ALJ did not err by finding that the controller job was past relevant work. *Id.* at 14-15.

Plaintiff's past employment included job responsibilities beyond those identified in the DOT's definition of controller, including bidding for contractors, negotiating lease rentals, managing rental properties, handling insurance, and handling year-end bonus payments and all human resources issues. As noted in *Pergentile v. Berryhill*, Civ. A. No. 16-1381 (KM), 2018 WL 5730173, at *12 (D.N.J. Nov. 1, 2018), the question is "one of characterization: Was the prior job a position defined by the DOT which happened in this case to have some excess or incidental duties? Or was the prior employment in fact a composite of two or more recognized jobs?"

The ALJ considered Plaintiff's Work Report, hearing testimony, the statement from Plaintiff's former employer, and the testimony from a vocational expert ("VE"). (R. 27.) The ALJ indicated that Plaintiff described her past work in her Work Report as "a controller at various establishments since September 1980" in which position "[s]he reported that she oversaw the accounting staff, which comprised about 20 people." (R. 27.) The ALJ also noted that Plaintiff "prepared sales tax returns and she reviewed quarterly reports" and "reviewed reports for eight companies." (R. 27.) With respect to Plaintiff's hearing testimony, the ALJ noted only that "the claimant testified that she did a lot of traveling on her last job." (R. 27.) In discussing the statement from Plaintiff's former employer, the ALJ noted that Plaintiff "had various positions over the years from the 1980s to July 2011" including "accounting clerk, bookkeeper, accounting office manager, purchasing agent, etc." (R. 27.) The ALJ also noted Mr. Calandra's representation that Plaintiff's "title was Controller and that her duties encompassed a much broader array of responsibility." (R.

27.)  The ALJ nonetheless adopted the testimony of the VE, who testified that Plaintiff's past work falls within the definition of controller (DOT # 160.167.058) as defined by the DOT and concluded that Plaintiff could perform that role as it is generally performed.  (R. 27.)

The job description for a controller as defined in the DOT is as follows:

> Directs financial activities of organization or subdivision of organization: Prepares, using computer or calculator, or directs preparation of, reports which summarize and forecast company business activity and financial position in areas of income, expenses, and earnings, based on past, present, and expected operations. Directs determination of depreciation rates to apply to capital assets. Establishes, or recommends to management, major economic objectives and policies for company or subdivision. May manage accounting department. May direct preparation of budgets. May prepare reports required by regulatory agencies. May advise management on desirable operational adjustments due to tax code revisions. May arrange for audits of company accounts.  May advise management about property and liability insurance coverage needed. May direct financial planning, procurement, and investment of funds for organization [TREASURER (profess. & kin.) 161.117-018].

DICOT 160.167-058 (G.P.O.), 1991 WL 647262 (Jan. 1, 2016).

While Plaintiff undoubtedly performed some of these job responsibilities, the ALJ failed to address the evidence concerning the additional duties that Plaintiff performed, including employee benefits, sexual harassment training, and property management.  The ALJ selectively highlighted the duties that fit within the DOT's definition of controller but did not discuss the other duties identified by Plaintiff in her Work History Report.  The ALJ also did not address Plaintiff's testimony that the title of controller was not "comprehensive enough" because she was a "jack of all trades."  (R. 50.)  As Plaintiff asserted in her post-hearing submission, she "wore many hats or job titles at any time" and "[t]here is no DOT counterpart job" for her past relevant work because

her past work was a composite job.  (R. 270.)  The ALJ failed to explain why he rejected these assertions.[6]

Because the ALJ did not engage in adequate analysis or make sufficient findings of fact as to whether Plaintiff's past work was a composite job, the Court cannot determine whether the Commissioner's decision is supported by substantial evidence.  Accordingly, the Court orders the case remanded for consideration of whether Plaintiff's past work was a composite job that included duties beyond the job of controller.  As noted above, a "claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work."  S.S.R. 82–62, 1982 WL 31386, at *3.  Plaintiff testified to many job duties beyond those of controller, yet the ALJ accepted the VE's characterization of Plaintiff's past work without resolving the conflicting testimony.  At the very least, the ALJ was required to explain his reasoning as to why Plaintiff's past work should not be considered a composite job involving responsibilities and physical demands beyond that of a typical controller.  *See Pergentile*, 2018 WL 5730173, at *12 (where ALJ defined plaintiff's past work as a daycare director with "incidental 'chores,'" court remanded case even though parties were "less helpful in identifying just what DOT-recognized jobs are encompassed by [the plaintiff's] additional duties" because "[t]he ALJ's analysis did not grapple with the issue of this having been a composite job, encompassing to some degree the duties of teacher, janitor, or receiver of shipments."); *Levyash*, 2018 WL 1559769, at *12 (where plaintiff testified that he was engineer for 27 years but switched

---

[6] The Court notes that Plaintiff made no objection at the hearing to the VE's testimony that her past relevant work fell under the title of controller.  However, because Plaintiff raised the issue in her post-hearing submission, the ALJ was on notice of Plaintiff's objection to the characterization of her past relevant work as controller instead of a composite job.

to a purchase agent job and ALJ concluded that plaintiff worked two separate jobs and not a compound job, court remanded case because ALJ "did not explain why she rejected Plaintiff's contention that his past relevant work was a composite job."); *Moody v. Comm'r of Soc. Sec.*, Civ. A. No. 15-8319 (JBS), 2016 WL 7424117, at *10-11 (D.N.J. Dec. 23, 2016) ("The ALJ never referenced Plaintiff's own descriptions of her past relevant work, but only cited to the VE testimony that the Plaintiff's past work experience should be classified as a School Administrator. . . . Plaintiff offers other jobs in which that [sic] Plaintiff could have been classified[.] . . . The Court will not decide specifically how Plaintiff should have been classified, as it will remand to allow the ALJ to properly classify Plaintiff's job."); *but see Colon Martinez v. Comm'r of Soc. Sec.*, Civ. No. 18-13468 (RBK), 2019 WL 3336336, at *3-4 (D.N.J. July 25, 2019) (rejecting plaintiff's contention that he worked a composite job, where plaintiff's own description of work demonstrated he primarily worked one job, did not show his job included "significant elements" of second job, did not argue that he was unable to perform function of job as generally performed in national economy, and did not object to VE's testimony concerning characterization of plaintiff's past work).

In so finding, the Court notes that Plaintiff bears the burden of proof, and for Plaintiff to prevail any error by the ALJ must not be harmless. *See Shinseki v. Sanders*, 556 U.S. 396, 409, 129 S. Ct. 1696, 173 L. Ed. 2d 532 (2009) (ordinary harmless error review, in which the appellant bears the burden to demonstrate harm, is applicable to administrative appeals). Plaintiff does not contend that she is unable to perform the other positions purportedly encompassed by her past work, as they are generally performed in the national economy. However, S.S.R. 82-61 states that composite jobs have no counterpart in the DOT, and the services of a VE may be necessary to determine how such jobs are usually performed. The VE in this case did not testify to the manner

in which the component jobs are generally performed.  Moreover, POMS DI 25005.020 instructs: "A composite job does not have a DOT counterpart, so do not evaluate it at the part of step 4 considering work 'as generally performed in the national economy.'"  POMS DI 25005.020, *available at* http://policy.ssa.gov/poms.nsf/lnx/0425005020.  In light of the foregoing, the ALJ's failure to address whether Plaintiff's past work was a composite job was not harmless error.  The ALJ found that Plaintiff cannot perform her past relevant work as it was actually performed. Therefore, if the ALJ had found that Plaintiff's past work was a composite job, he could not have concluded that Plaintiff was able to perform such position as generally performed, and he would have proceeded to Step Five of the sequential evaluation.  Accordingly, a remand is warranted.

### B.    Plaintiff's Challenge to the RFC Determination

Plaintiff next challenges the ALJ's analysis of the medical evidence in crafting her RFC. Plaintiff specifically contends that the ALJ erroneously gave too much weight to the opinions of Dr. Fernando and Dr. Galakos, arguing that these opinions were based on incomplete information and failed to take into account medical evidence of record.  ECF No. 13 at 20.

Plaintiff argues that the ALJ erred in only limiting Plaintiff to sedentary work because such work, by definition, includes two hours of standing and walking and Dr. Fernando opined that weightbearing could be painful due to Plaintiff's knee condition.  *Id.* at 21.  According to Plaintiff, "the ALJ failed to explain how [Plaintiff] could sustain the two hours of walking and standing required of sedentary work activity despite such pain."  *Id.*  This argument fails for three reasons. First, S.S.R. 96-9p defines sedentary jobs as jobs where walking and standing are required only "occasionally," which is defined as "occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday."  Social Security Ruling 96-9p, *Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work*

– *Implications of a Residual Functional Capacity for Less than a Full Range of Sedentary Work*, 1996 WL 374185, at \*3 (S.S.A. July 2, 1996). Thus, sedentary work does not *mandate* two hours of walking and standing as argued by Plaintiff; in fact, it may involve "very little" walking and standing. Second, while Dr. Fernando opined that weightbearing could be painful, he did not opine as to how long Plaintiff could stand or walk at one time or how many times Plaintiff could stand or walk throughout an 8-hour workday. His opinion does not address Plaintiff's functional limitations and thus does not undermine the ALJ's RFC determination. Third, Plaintiff's own testimony refutes her argument that she is unable to perform sedentary work even if such work requires occasional standing and walking. Plaintiff testified that she cannot sit for more than thirty minutes before she must stand or walk, she does not sit all day and has to alternate positions, and she can stand for ten or fifteen minutes and walk fifteen to twenty minutes at a time. (R. 48, 60-61.) Based upon Plaintiff's own complaints of needing to change position, the ALJ crafted the RFC to require that Plaintiff have the ability to alternate sitting and standing every 1/2 to one hour at her election. (R. 26.) Given the evidence of record, the Court finds that the ALJ's RFC assessment that Plaintiff is limited to sedentary work with a sit/stand option is supported by substantial evidence.

Plaintiff's second argument is that the ALJ erred in relying on Dr. Fernando's opinion because Dr. Fernando did not have access to Plaintiff's past medical records when he examined Plaintiff in April 2013. ECF No. 13 at 21. Plaintiff notes specifically that a prior EMG/NCV study from May 2012 confirmed that Plaintiff had right C5 radiculopathy and left L5/S1 radiculopathy. *Id.* Plaintiff contends that "[t]he failure to provide Dr. Fernando with this information, and other clinical evaluations and objective testing, resulted in clear error precluding reliance on his opinion as substantial evidence in support of the RFC finding." *Id.*

Dr. Fernando diagnosed Plaintiff with chronic pain in the lower back and cervical spine based on the subjective symptoms of radiculopathy, notwithstanding the lack of a clinical indication of disc involvement or impingement of the nerves. (R. 488-89.) Plaintiff does not explain how Dr. Fernando's opinion would have differed if he had reviewed a prior study confirming radiculopathy. Moreover, even without a report from the EMG/NCV study, Dr. Fernando was aware that Plaintiff was previously treated for radiculopathy but concluded, based on his in-person examination of Plaintiff in 2013, "that it does not appear that there has been any persistence of the disk problems or the nerve root impingement *that is evident now*." (R. 489)(emphasis added). The treating notes from Core Pain Management demonstrate that once Plaintiff was diagnosed with radiculopathy through the EMG/NCV study, Plaintiff received epidural steroid injections that improved her condition.[7] Plaintiff fails to articulate how Dr. Fernando's opinion is flawed when (1) he diagnosed Plaintiff with chronic back pain based upon her subjective symptoms of radiculopathy, even in the absence of the EMG/NCV report, (2) the EMG/NCV study was performed nearly one year prior to Dr. Fernando's exam, and the medical records subsequent to that report indicate that Plaintiff's condition improved, and (3) Dr.

---

[7] *See, e.g.*, R. 416 ("Today's neurological studies revealed that the patient has a right C5 and left L5-S1 radiculopathy. Based on these findings along with the MRI and physical exam results, the patient is a good candidate for first a right-sided C6-C7 epidural steroid injection and then a left-sided L5-S1 interlaminar epidural steroid injection."); R. 417 ("She presents herself today status post cervical epidural steroid injection performed on 6-23-12. She states the injection has helped reduce her cervical pain. Her neck pain is now a 4/10. The radiating pain into her left arm and the upper extremity numbness has reduced since the injection. Her chief complaint today is low back pain radiating into both her legs."); R. 420 ("She is status post a left-sided lumbar L5-S1 interlaminar epidural steroid injection. She states that the left side feels a little better and the leg pain is no longer present; however, she still has residual lower back pain that seems to be worse on the right side. Overall, she reports a pain reduction from an 8 to a 6 and would like to proceed with one more injection[.]"); R. 424 ("The patient is a candidate for a right-sided L5-S1 interlaminar epidural steroid injection to further decrease the inflammation in the epidural space. I believe this will definitively relieve the patient's lower back pain.").

31

Fernando's opinion, based on an in-person examination of Plaintiff, was that her history of a disc problem or nerve impingement had subsided. Consequently, Plaintiff fails to demonstrate that the ALJ erred by giving substantial weight to Dr. Fernando's report even though Dr. Fernando had not reviewed the EMG/NCV study.[8]

Plaintiff's third argument is likewise unavailing. Plaintiff contends that the ALJ failed to properly consider "other significant medical evidence before equating Dr. Fernando's opinion to the ability to perform sedentary work." ECF No. 13 at 22. Plaintiff then cites in bullet point format fourteen medical records and two generalized references to medical records without any analysis of how the ALJ failed to properly consider such evidence. The Court finds that this general attack on the adequacy of the ALJ's RFC explanation to be without merit. Plaintiff does not assert that the ALJ failed to consider the evidence; she only vaguely asserts that the ALJ did not *properly* consider such evidence. *Id.* In fact, of the fourteen pieces of evidence identified by Plaintiff, eleven pieces of evidence were expressly addressed by the ALJ in his written decision.[9] The three records that were not cited by the ALJ were a June 7, 2012 MRI of Plaintiff's left knee (R. 459),

---

[8] In addition to Dr. Fernando's report finding that Plaintiff's back condition was improved as of April 2013, the ALJ also referenced an MRI performed in 2014 which showed minimal disc bulge at C5-6 level and no other abnormalities, and treatment records from January 2015 which noted that Plaintiff's lumbar spine was normal, no trigger points, and that she had full range of motion. (R. 25.) Based on all of this evidence, the ALJ concluded that "[t]he evidence does establish cervical and lumbosacral strains after automobile accidents in December 2010 and October 2011 with underlying disc disorder and subjective radiculopathy; which was relieved with conservative treatment i.e. pain medication, physical therapy and epidural treatment and by early 2013, it appears that acute symptoms had subsided." (R. 25.) Indeed, medical records from 2014 and 2015 demonstrate that Plaintiff's chief complaints were knee and shoulder pain and not back pain.

[9] Some of the ALJ's references to the record were erroneous. For example, the ALJ referred to Exhibit 12F, page 11 when referencing a January 7, 2012 MRI, but the record is contained at Exhibit 12 F, page 21. The ALJ referred to evidence of Plaintiff's shoulder pain at Exhibit 21F, page 7, but Exhibit 21 F does not contain a page 7. It appears the ALJ was referring to Exhibit 25F, page 7, which concerns an MRI of Plaintiff's shoulder.

an August 2013 X-ray of Plaintiff's left knee (R. 506), and an August 2013 X-ray of Plaintiff's back.  (R. 506).[10]   The ALJ considered Dr. Fernando's opinion, as well as records that pre-dated and post-dated such opinion, and provided detailed findings related to Plaintiff's limitations. Because Plaintiff's attack is limited to unsupported statements and does not provide an affirmative argument for how the ALJ's decision is not supported by substantial evidence, the Court finds no error in the ALJ's comprehensive assessment of the medical evidence of record.

Importantly, Plaintiff fails to articulate how the ALJ's allegedly erroneous review of the evidence would have resulted in Plaintiff having an RFC different from the RFC assessed by the ALJ.  *See Jones v. Astrue*, Civ. A. No. 10-3226 (NLH), 2011 WL 4478489, at *6 (D.N.J. Sept. 26, 2011) (ALJ found that plaintiff had RFC to perform sedentary work and plaintiff did not show how consideration of additional limitations would change that assessment).  The ALJ limited Plaintiff to sedentary work with a sit/stand option based on her back and knee impairments, he limited her range of motion to no overhead reaching with the right arm to account for Plaintiff's shoulder impairment, and he limited the RFC to no continual and repetitive moving head left to right to address Plaintiff's complaints of neck pain.  (R. 26.)  While Plaintiff generally complains that the medical evidence demonstrates much more severe impairments than found by the ALJ, the

---

[10] Of these three pieces of evidence, the only one that is arguably inconsistent with the ALJ's written decision is the August 2013 record that references x-rays of Plaintiff's back.  The ALJ concluded that although Plaintiff had "underlying disc disorder and subjective radiculopathy" after her car accidents in 2010 and 2011, "it appears that acute symptoms had subsided" by early 2013. (R. 25.)  The August 2013 report, however, is evidence that Plaintiff continued to experience back pain later in 2013.  Nonetheless, the ALJ expressly considered a report from Dr. David dated July 22, 2013 in which Plaintiff similarly reported lower back pain and an MRI performed in March 2014 which was "consistent with lessening of acute cervical strain as time passed and with treatment."  (R. 25.)  Because the ALJ analyzed evidence that coincided with the time period encompassed by the August 2013 report and nevertheless concluded that Plaintiff's back impairments improved over time, the Court finds that the ALJ's failure to explicitly refer to one report does not warrant a finding that the ALJ's opinion was not supported by substantial evidence.

Court finds that the ALJ fully considered the objective medical evidence in determining Plaintiff's RFC.[11]  The ALJ did not base his determination solely on the opinion of Dr. Fernando, but also considered the medical records that post-dated that opinion.  Thus, the Court rejects Plaintiff's generalized assertion that the ALJ failed to properly consider the evidence as a basis for remand.

Plaintiff's argument, concerning the ALJ's partial reliance on the report of Dr. Galakos, is relegated to a footnote.  ECF No. 13 at 21 n.6.  Plaintiff appears to argue that because the opinions of Dr. Galakos and Dr. Fernando were rendered in 2013 and the record contains medical evidence that post-dates these opinions, the ALJ erred in giving weight to these reports.  *Id.*  The Court rejects Plaintiff's arguments.  First, Plaintiff's statement that Dr. Galakos did not have the opportunity to review evidence concerning Plaintiff's shoulder and spine conditions is belied by the report itself.  The report specifically indicates that Dr. Galakos considered MRIs of Plaintiff's shoulder, cervical spine, lumbar spine, and knee, as well as the EMG/NCV study that confirmed right C5 radiculopathy and left L5/S1 radiculopathy.  (R. 98-99.)  Second, to the extent that Plaintiff's argument is that Dr. Galakos did not review later evidence of Plaintiff's impairments, the administrative record indicates that the ALJ only partially relied on Dr. Galakos' opinion but also considered medical evidence for the entire period of 2010 through January 2015 and did not limit his review to the documents considered by Dr. Galakos.

In sum, Plaintiff fails to demonstrate that the ALJ's RFC determination is not supported by substantial evidence.  The ALJ undertook an extensive review of the medical evidence as well as Plaintiff's subjective complaints as discussed below; found that Plaintiff's knee, shoulder, back

---

[11] Importantly, Plaintiff does not assert that her conditions were so severe that she should have been deemed disabled at Step Three.  She frames her argument only in the context of the RFC determination and offers a generalized response that her conditions were more severe than determined by the ALJ.  She does not specifically argue how her conditions – if more severe than found by the ALJ – imposed additional limitations on her ability to function in the workplace.

and neck impairments caused Plaintiff pain when she performed certain exertional tasks; and crafted the RFC accordingly. Plaintiff cites no evidence that would support functional limitations beyond those already contained in the ALJ's RFC determination. The Court finds that the RFC assessment is supported by the medical evidence of record.

### C.    Plaintiff's Subjective Complaints

Plaintiff next claims that the ALJ failed to properly evaluate or weigh her subjective claims as to the severity of her symptoms. "Credibility determinations as to a claimant's testimony regarding pain and other subjective complaints are for the ALJ to make." *Malloy v. Comm'r of Soc. Sec.*, 306 F. App'x 761, 765 (3d Cir. 2009) (citing *Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983)). The ALJ is required to assess the credibility of a claimant's subjective complaints using a two-step process. *See* 20 C.F.R. § 404.1529. First, the ALJ must determine whether the record demonstrates that the claimant possesses a medically determinable impairment that could reasonably produce the alleged symptoms. *See Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 119-20 (3d Cir. 2016) ("[w]hile there must be objective evidence of some condition that could reasonably produce pain, there need not be objective evidence of the pain itself.") (internal quotation omitted). Second, the ALJ must assess the credibility of the claimant's complaints regarding the intensity of the symptoms. To do this, the ALJ must determine if objective medical evidence supports the claimant's complaints. If so, the complaints should be given great weight and "may not be disregarded unless there exists contrary medical evidence." *Id.*

If objective medical evidence does not support the claimant's complaints, then the ALJ must consider other factors, including: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain; (3) any precipitating or aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken by claimant to alleviate the

pain; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms, (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c)(3).  The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  Social Security Ruling 96-7p, *Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).[12]  The ALJ cannot simply state that the "allegations have been considered" or that they categorically are not credible.  *Id.* at *2.

Plaintiff points to evidence that she believes demonstrates inconsistencies in the ALJ's reasoning concerning her medical impairments, but she does not identify how those alleged inconsistencies resulted in an erroneous RFC determination.  Plaintiff must "affirmatively identify evidence that the impairment imposes additional limitations on his or her functional capabilities." *Gullace v. Colvin*, Civ. A. No. 15-7630 (FLW), 2017 WL 714356, at *10 (D.N.J. Feb. 23, 2017)(citing *Rutherford v. Barnhart*, 399 F.3d 546, 553 (3d Cir. 2005)).  When alleging that an ALJ committed error in his or her analysis, "the party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'"  *Shinseki*, 556 U.S. at 409 (quoting *Palmer v. Hoffman*, 318 U.S. 109, 116, 63 S. Ct. 477, 87 L. Ed. 645 (1943)).  Plaintiff generally complains that the ALJ failed to consider certain evidence, but she

---

[12] Social Security Ruling 96-7p applies to SSA decisions that, like the ALJ decision in this case, were made prior to March 28, 2016.

does not argue that such evidence would have required limitations on her ability to function in the workplace beyond those already contained in the RFC.

For example, Plaintiff complains that the ALJ incorrectly interpreted the medical evidence concerning her headaches. ECF No. 13 at 25. The ALJ noted that "[t]he claimant has complained of headaches associated with chronic pain; however, they are not migraine related and are not shown to be chronic. Treatment records from Dr. Tartaglia at Exhibit 12F indicate that they are relieved with medication i.e. Fioricet." (R. 25.) Plaintiff points to various notations in Dr. Tartaglia's treatment notes in which she reported headaches, even after she began taking Fioricet. ECF No. 13 at 25 (citing R. 453, 455, 460-62, 467-68.) However, Plaintiff cites no evidence concerning how long her headaches lasted or the extent to which they caused functional limitations. At the hearing she testified that after her car accident the headaches "lasted about three weeks, but pretty much they subsided." (R. 55.) Because Plaintiff has not demonstrated that her headaches inhibited her functioning in a manner that would change the ALJ's RFC assessment, she fails to meet her burden at Step Four to show that remand is appropriate. *See Rodriguez v. Colvin*, Civ. A. No. 14-6461, 2017 WL 462630, at *7 (D.N.J. Feb. 3, 2017) ("The plaintiff maintains the burden at steps one through four, and must present evidence establishing that each alleged ailment either individually or collectively limited his ability to perform work.") (citation omitted); *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009) ("A diagnosis alone, however, does not demonstrate disability. Rather, [the plaintiff] was required to show that his headaches significantly limited his physical or mental ability to do basic work activities.") (citations omitted).

Similarly, Plaintiff points to evidence that her right shoulder condition worsened. The ALJ specifically indicated that he took "her complaints of right shoulder and neck pain and limitations

into account" and crafted an RFC with "no lifting overhead with right arm" and "no continual and repetitive movement of the head left to right."  (R. 23, 26.)  While Plaintiff in reply contends that "the objective medical evidence confirms the severity of her shoulder injury," Plaintiff fails to indicate how the RFC should have been further limited in light of her condition.  ECF No. 17 at 7.

Plaintiff's general assertion that "[c]linical examinations were also repeatedly abnormal" likewise fails to meet her burden of demonstrating that her medical impairments inhibited her functioning in a manner that would have changed the ALJ's RFC assessment.  Again, in reply Plaintiff argues that "the objective medical evidence confirms the severity of her . . . knee impairment, and cervical and lumbar radiculopathy and the source, consistency, and severity of her resulting pain."  ECF No. 17 at 7.  The records cited by Plaintiff relate to her back, knee and shoulder conditions, but those conditions were accounted for in the RFC.  Plaintiff must "present evidence demonstrating '*how* [she] might have prevailed at step [four] if the ALJ's analysis had been more thorough[.]'"  *Rodriguez*, 2017 WL 462630, at *7 (citing *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 801, 814 (3d Cir. 2016))(emphasis in original).  Plaintiff's generalized assertion fails to provide a sufficient basis to warrant remand.  *See id.*

Plaintiff also faults the ALJ for commenting that Plaintiff returned to work after her car accidents.  ECF No. 13 at 25.  Plaintiff notes that although she did return to work, her work performance was poor, she had to lay down on occasion, and she was ultimately fired for poor work performance.  *Id.*  The ALJ only noted that Plaintiff returned to work after her car accident; he did not indicate that he discounted Plaintiff's limitations because she returned to work.  (R. 24.) In fact, the ALJ noted the VE's testimony that Plaintiff's past work could not have been performed, as Plaintiff actually performed it, given the limitations of her impairments. (R. 27.)  Accordingly,

the Court finds no basis for remand in the ALJ's reference to the fact that Plaintiff returned to work.

Finally, Plaintiff argues that the ALJ should not have used Plaintiff's ability to perform some minimal activities of daily living to determine that she was able to work full time. ECF No. 13 at 26. Social Security Ruling 96–7p explicitly states that an ALJ must consider a claimant's daily activities when assessing credibility. Likewise, the Third Circuit has clarified that while "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity . . . [i]t is nonetheless appropriate for the ALJ to consider the number and type of activities in which the claimant engages." *Turby v. Barnhart*, 54 F. App'x 118, 121 n. 1 (3d Cir.2002) (internal quotation marks and citations omitted).

The ALJ noted Plaintiff's self-reports that she does light chores, light shopping, simple cooking, and drives independently short distances. (R. 26.) Plaintiff contends that her full testimony demonstrates that she does not drive every day, and when she does she only drives for twenty minutes; her daughter goes with her to the grocery store and unloads the groceries; her husband or a cleaning service cleans the house; her husband does most of the cooking because Plaintiff cannot stand long enough; and she cannot work on her own bank statement. ECF No. 13 at 26. Plaintiff argues that because she cannot perform these activities of daily living, she cannot perform work on a sustained basis. *Id.*

The daily activities that Plaintiff cites primarily relate to the exertional demands of standing, sitting for long periods, lifting and reaching, but the ALJ expressly stated that he credited Plaintiff's complaints of pain caused by such exertional factors. For instance, in addition to considering the medical evidence which supported a finding that Plaintiff can only perform sedentary work with limitations on lifting, the ALJ stated: "I have taken [Plaintiff's] complaints

of needing to alternate position into account in finding that she must be able to alternate sit/stand option every 1/2 to one hour and I have taken her complaints of right shoulder and neck pain and limitations into account in finding no overhead lifting with the right arm and no continual and repetitive movement of the head left to right." (R. 26.)  The ALJ also noted in assessing Plaintiff's credibility that she continued to look for work after she was laid off and she collected unemployment for at least a year, which conduct is inconsistent with Plaintiff's allegation that her impairments rendered her unable to perform sustained work activity.  "Courts in this Circuit have stated that a claimant's application for unemployment compensation may adversely affect her credibility."  *Mellor-Milam v. Comm'r of Soc. Sec.*, Civ. A. No. 13-cv-5732 (JBS), 2014 WL 7405209, at *13 (D.N.J. Dec. 30, 2013) (citing *Myers v. Barnhart*, 57 F. App'x 990, 997 (3d Cir. 2003)(noting that it was "entirely proper for the ALJ to consider that Myers' receipt of unemployment benefits was inconsistent with a claim of disability during the same period.")).  Concerning Plaintiff's allegation of impaired concentration, the ALJ noted that the medical evidence did not support this complaint: "Dr. Friedman who performed a psychological consultative examination in April 2013 reported that memory, concentration and attention span were adequate and that cognitive problem solving pace was relatively fast."  (R. 25.)[13]  Plaintiff fails to demonstrate that the ALJ erroneously evaluated her activities of daily living in assessing Plaintiff's RFC.

---

[13] Plaintiff contends that because medical evidence confirms the severity of her shoulder injury, knee impairment, and back conditions, and the pain resulting therefrom, the ALJ erred in finding that Plaintiff can perform skilled work because of the distraction caused by Plaintiff's pain.  ECF No. 13 at 24.  As noted above, however, the restrictions in Plaintiff's RFC are designed to minimize the conditions that cause Plaintiff pain. Furthermore, Dr. Friedman concluded that Plaintiff's concentration and attention span were adequate.  (R. 25-26.)  The Court cannot conclude that the ALJ failed to assess Plaintiff's allegations of pain and limitations in light of the analysis in his written decision.

For the reasons stated above, the Court holds that the ALJ's determination of Plaintiff's credibility was supported by substantial evidence.  The Court finds no basis to remand the case to the Commissioner for a reassessment of the RFC, but only for a redetermination on Plaintiff's ability to perform her prior relevant work at Step Four and, if indicated, an analysis at Step Five.

## VI.    CONCLUSION

For these reasons, the Court reverses the Commissioner's decision that Plaintiff was not disabled and remands the case to the Commissioner for further proceedings in accordance with the preceding instructions and the accompanying Order.


Dated: February 5, 2020                          s/ Paul A. Zoss
At Newark, New Jersey                      PAUL A. ZOSS, U.S.M.J.